NOT FOR PUBLICATION                                                                                          CLOSED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                            :
SHIRLEY A. DOUGLAS,                         :
                                            :
                        Plaintiff,          :
            v.                              :    CIVIL ACTION NO. 05-5726
                                            :
JO ANNE B. BARNHART,                        :
COMMISSIONER OF SOCIAL                      :
SECURITY,                                   :    **OPINION**
                        Defendant.          :
_____:

APPEARANCES:

Pamela S. Levine, Esq.
Binder and Binder, P.C.
215 Park Avenue South, 6th Floor
New York, NY 10003
        Attorney for Plaintiff


Christopher J. Christie, Esq.
United States Attorney
Ellen E. Sovern, Esq.
Special Assistant United States Attorney
Office of the United States Attorney
Social Security Administration
26 Federal Plaza, Room 3904
New York, NY 10278
        Attorneys for Defendant

PISANO, District Judge.

Shirley A. Douglas ("Plaintiff") appeals the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her request for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 423 and 1383.  This Court has jurisdiction to review the matter under 42 U.S.C. § 405(g) and decides the matter without oral argument.  See Fed. R. Civ. P. 78.  For the reasons that follow, the Court remands this case for further proceedings consistent with this opinion.

## I. BACKGROUND

*A. Plaintiff's Personal and Medical History*

### 1. Plaintiff's Personal History

Plaintiff is a fifty-nine year old woman with a high school education. She also attended three years of business school part-time, earning a certificate in secretarial word processing.  (AR 87, 403-4).  Plaintiff has primarily worked as a legal assistant.  From February 1982 through March 1993, and again from March 1998 through November 2001, she was a secretary in several law offices.  (AR 129).  Her duties included typing, answering phones, managing the office, and making appointments.  (AR 82, 403-4).  From August 1995 through February 1997, she worked as a cook at a nursery school.  (AR 129, 405-6).  Between October 1996 and May 2000, Plaintiff worked a second job supervising teenagers for out-of-home placements.  (AR 129, 404).  She also reported working for about nine months filling positions at a temp agency.  (AR 406-7).  From 1992 to 2000, she was self-employed as an office assistant, where her duties included typing, answering telephones, making appointments, and interviewing clients.  (AR 104, 130).

At present, Plaintiff's daily activities include watching TV and listening to the radio. (AR 415). She testified that she is driven to the supermarket for groceries and relies on neighbors and friends to clean her apartment. (AR 417).

Plaintiff asserts that she was disabled as of November 8, 2001. Her alleged impairments include severe body pain and numbness, arthritis, migraines, hearing loss, and blurred vision. Plaintiff also describes having difficulty using her hands and fingers, as well as sitting for long periods of time. (AR 406). In addition, Plaintiff reports suffering from depression and panic attacks, which make sleeping and eating difficult. (AR 411-12).

### 2. Plaintiff's Medical History–Ophthalmological

Plaintiff saw several physicians regarding her ophthalmological impairments. Dr. Ronald Glassman ("Dr. Glassman") evaluated Plaintiff on September 24, 2001. (AR 165-166). Plaintiff reported a history of amblyopia in both eyes and ocular burning/photophobia for the prior two hours. Her visual acuity with glasses was 20/200 in the right eye and 20/25 in the left. Dr. Glassman's examination revealed a corneal abrasion of the left eye.

Upon the request of the Commissioner, ophthalmologist Alvin Seligson ("Dr. Seligson") examined Plaintiff on March 20, 2002. (AR 170-72). Plaintiff reported multiple episodes of eye pain, redness, and blurred vision. (AR 172). She stated that she had visited Dr. Glassman for these conditions (though Dr. Glassman saw Plaintiff for treatment only once). Id. Plaintiff also reported poor vision of the right eye since childhood. Id. Dr. Seligson's external examination showed no problems in either eye. Id. Visual acuity with correction was 20/200 in the right eye and 20/30 in the left. Id. Dr. Seligson observed that Plaintiff may have experienced several episodes of subconjunctival hemmorhages or conjunctivitis in the past, but found none at present.

Id. Retinoscopy indicated a minimal refractive error in the right eye and a correction similar to that which she was wearing in her left eye. Id. Ocular tension was normal, as were Plainitff's disks, masculae and vessels in each eye. Id.

Dr. Seligson also performed visual fields tests. Id. These tests revealed a visual field of approximately fifteen degrees in the right eye and thirty five degrees in the left eye. Id. All other examination results were normal. Id. Dr. Seligson concluded that Plaintiff was not visually handicapped and did not suffer from permanent ocular disability. Id.

### 3. Plaintiff's Medical History–Psychiatric

On March 20, 2002, Dr. Sheo Prasad ("Dr. Prasad") performed a consultative evaluation of Plaintiff. Dr. Prasad opined in his report to the SSA that there may be a psychosomatic overlay to Plaintiff's alleged impairments. On March 28, 2002, State agency physician Dr. Benito Tan ("Dr. Tan") reviewed Plaintiff's medical records for indications of a psychiatric impairment. Dr. Tan found no psychiatric complaints, treating sources, hospitalizations, or medications. (AR 178). Dr. H. Multani ("Dr Multani"), reviewing the evidence on August 7, 2002, came to a similar conclusion. (AR 197). He noted that Plaintiff was taking Zoloft for a sleep problem, but advised that no psychiatric consultation was needed, since Plaintiff's problem was primarily physical. Id.

Plaintiff testified at her hearing that she suffers from depression and anxiety attacks. The ALJ noted in his opinion that she first began making these allegations in December 2002 (AR 29, 127). In a statement of her recent medical history, Plaintiff listed that she began taking Elavil for depression and headaches on June 27, 2003, and Lorazepam for anxiety attacks on September 12, 2003. (AR 133). The record includes a prescription for Elavin written on December 19, 2003, as

4

well as one for Paxil, a medication commonly prescribed for depression and anxiety disorders, but there is no indication of the conditions for which these medications were prescribed. (AR 140).

### 4. Plaintiff's Medical History--Other Medical Evidence

Plaintiff visited Dr. David Rosenbaum ("Dr. Rosenbaum") on August 8, 2000, complaining of numbness and constant sensations of tingling, involuntary twitches in her upper body, lower back pain, stiffness in her neck, and migraines. (AR 188). Dr. Rosenbaum noted alteration of vibratory sense in the left frontal bones, decreased pin and cold sensation, sluggish deep tendon reflexes, and tenderness in the cervical, paracervical, and lumbar muscles, as well as the sacroiliac joints. (AR 189). Dr. Rosenbaum diagnosed cervical and lumbar disc disease, rule-out radiculopathy, temporomandibular joint pathology, and rule-out cerebral process. Id. An MRI of the cervical spine taken on January 10, 2001 showed an annual bulge with adjacent spondylitic changes at C4-C5 and an annular bulge at C5-C6. An MRI of the lumbar spine showed multilevel lumbar disc desiccation and myomatous uterous. (AR 190-1).

On March 20, 2002, Dr. Sheo Prasad ("Dr. Prasad") performed a consultative examination at the request of the Commissioner. (AR 173-7). Plaintiff complained of constant pain in her shoulders and lower back, numbness and tingling in her hands, headaches, and dizziness. (AR 173). She stated that she had bruises, swelling, and pain in her ankle, but her ankle showed no marks or swelling. (AR 174). Plaintiff reported that she was independent in her daily activities. Id. She did light cooking and cleaning and could walk about one-half mile, but complained of pain in her hips and knees when climbing. Id.

Dr. Prasad recorded that Plaintiff was well-developed, well-nourished, and alert. Id. Dr.

Prasad stated that Plaintiff looked tense but cooperated during the examination. (AR 175). His examination of Plaintiff's eyes, ears, nose, throat, and neck revealed no findings. (AR 174). Plaintiff was able to walk with an even gait on a level surface. She could also walk on her heels, toes, and tandem without problems. Id. Her dexterity for fine motor skills was slow, but she had full grip strength and full muscle strength in the upper and lower extremities, and her deep tendon reflexes were equal. Id. Her range of motion of the spine and spinal curvature were normal. Id. Dr. Prasad found mildly impaired sensation at C5, C6, C7, and C8 dermatomes, but also noted that Plaintiff's responses to sensation testing were not consistent, nor were her answers to the touch and pinprick test in both hands. Id. Dr. Prasad stated that there appeared to be a more psychosomatic overlay of the physical findings. (AR 175). Dr. R. Carducci reviewed the foregoing evidence on March 28, 2002 and determined that Plaintiff's arthritic impairment was not severe. (AR 179).

     In December 2002, Plaintiff began seeing chiropractor Dr. Wayne Poller ("Dr. Poller"). Plaintiff reported pain and tightness in the shoulders, pain and stiffness in the neck, and pain in her back and upper legs, tenderness in the knees, headaches, and loss of sleep. (AR 232). After examining Plaintiff, Dr. Poller diagnosed nonallopathic lesions of the head, thoracic, and pelvic regions. (AR 235). In a letter to the Social Security Administration dated January 2, 2003, Dr. Poller stated that Plaintiff suffers from fibromyalgia, which he was treating with a protocol of conservative physical therapy and chiropractic care. (AR 231). On March 14, 2003, Dr. Poller recorded in his progress report that Plaintiff's complaints were all improved or much improved, but his diagnosis remained unchanged. (AR 239). In a letter to the Social Security Administration, however, Dr. Poller diagnosed Plaintiff with chronic discongenic brachial

neuritis, discongenic myofscitis, fibromyalgia, and multiple level ankylosing spondylosis. (AR 238). Dr. Poller stated that extensive treatment produced marginal results and concluded that the Plaintiff was precluded from working. Id.

On August 8, 2003, Plaintiff visited Hackensack University Medical Center ("Hackensack") for spine, hip, and knee x-rays, as requested by Dr. Padma Chava ("Dr. Chava"). Plaintiff's hip x-rays showed mild arthritic change, mild osteitis pubis, and a calcified uterine myoma. (AR 283). Lumbosacral spine x-rays revealed mild arthritic change, calcified uterine myoma, and several smaller pelvic calcifications. (AR 284). Cervical spine x-rays showed mild arthritic change and straightening. (AR 285). Knee x-rays showed mild osteoarthritis. (AR 286). None of these x-rays revealed a fracture, dislocation, or malalignment. (AR 283-6). X-rays requested by Dr. Manoochehr Abadian ("Dr. Abadian") and taken on September 12, 2003 at Englewood Hospital and Medical Center ("Englewood") showed similar results. (AR 287-9). Plaintiff reported that Dr. Abadian also prescribed her Lorazepam for anxiety attacks and Flexeril for pain and muscle spasms during this visit. (AR 133). Dr. Chava referred Plaintiff for physical therapy on December 29, 2003. (AR 297-8).

Finally, the record shows that Plaintiff was treated at the Hackensack emergency room on February 6, 2004 for left eyelid irritation and the Englewood emergency room on February 23, 2004 for back pain. (AR 299-302). Plaintiff was given a prescription for pain medication during this latest visit. (AR 302). Plaintiff also listed taking Celebrex for arthritis and Elavil for depression and headaches, and prescriptions for Paxil and the asthma medication Albuterol appear in the record, but there is no documentation of the visits upon which these medications were first prescribed. (AR 133, 139-40).

*B. Procedural History*

On November 26, 2001, Plaintiff filed an application for Social Security Disability Insurance ("SSD") benefits, alleging an onset date of November 8, 2001, due to an array of physical ailments. The Social Security Administration (the "SSA") denied Plaintiff's application initially and upon reconsideration. Plaintiff's requested a hearing on November 26, 2002. A hearing was held on December 4, 2003 before Administrative Law Judge ("ALJ") Herbert Rosenstein ("Rosenstein"). Plaintiff was apprised of her right to a representative, but chose to appear pro se. Plaintiff submitted evidence to the ALJ and provided testimony during the hearing. The ALJ also requested information from two of Plaintiff's treating sources. (AR 290, 295).

On May 21, 2004, ALJ Rosenstein issued a decision ruling that Plaintiff was not disabled. The ALJ's decision was accompanied by the following findings:

> 1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2005.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3. The claimant has an impairment or combination of impairments considered "severe" based on the requirements in the Regulations, namely, amblyopia of the right eye and mild osteoarthritis of the hips, knees, and spine. (20 CFR §420.1520(b)).
>
> 4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.
>
> 5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible, and they are not supported by the substantial evidence of record.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of claimant's impairments. (20 CFR §404.1527).

7. The claimant has the residual functional capacity to perform a wide range of sedentary to light work, or work that does not require lifting in excess of 10 pounds frequently or 15 pounds occasionally. She can sit, stand, and walk intermittently throughout an 8-hour workday, and she can bend and stoop occasionally, but not frequently. The claimant has no other documented postural, manual, mental, or environmental limitations. The claimant's minor visual limitation would not significantly erode her occupational base, as she worked all of her adult life with this impairment.

8. The claimant's past relevant work as office assistant and cook in a nursery school did not require the performance of work-related activities precluded by her residual functional capacity. (20 CFR § 404.1565).

9. The claimant's medically determinable impairments, i.e., arthritis of the knees, hips, cervical and lumbar spines; and amblyopia of the right eye do not prevent her from performing her past relevant work.

10. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision. (20 CFR § 404.1520(e)).

Plaintiff requested review of the ALJ's decision by the Social Security Appeals Council (the "Appeals Council") on June 29, 2004. Plaintiff also retained counsel, who submitted comments and additional evidence on her behalf on April 8, 2005. (AR 395-8). The Appeals Council denied Plaintiff's request on October 7, 2005, adding that Plaintiff's additional evidence did not provide a reason for changing the ALJ's decision. (AR 6). Thus, ALJ Rosenstein's ruling became the final decision of the Commissioner.

Plaintiff now challenges the ALJ's ruling on the grounds that (1) the Commissioner did not properly develop the record; (2) the Commissioner erred in her conclusion that Plaintiff's mental impairment is "non-severe"; (3) the Commissioner's determination of the jobs Plaintiff would be able to perform was not in accordance with the proper legal standards; and (4) the ALJ failed in his duty to use heightened care in developing the record of a pro se claimant.

## II. DISCUSSION

### *A. Standard of Review*

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C. § 405(g); § 1383(c)(3) ("The final determination of the Commissioner of Social Security. . . shall be subject to judicial review as provided in section 405(g) . . ."); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993).  More than a "mere scintilla," substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(quotation omitted).  The inquiry is not whether the reviewing court would have made the same determination, but rather whether the Commissioner's conclusion was reasonable.  See  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Thus, substantial evidence may be less than a preponderance.  Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988).

> Some types of evidence will not be "substantial."  For example,
> [a] single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by
> countervailing evidence.  Nor is evidence substantial if it is overwhelmed by
> other evidence - particularly certain types of evidence (e.g. that offered by
> treating physicians) - or if it really constitutes not evidence but mere
> conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

The reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'"  Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301,

10

303 (6th Cir.1988) (internal citation omitted)).  The Commissioner has a corresponding duty to facilitate the court's review:  "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."  Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  As the Third Circuit has noted, access to the Commissioner's reasoning is necessary for a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  Nevertheless, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams, 970 F.2d at 1182.

### B. The Five-Step Analysis for Determining Disability

Social Security Regulations provide a five-step sequential analysis for evaluating whether a disability exists.  See 20 C.F.R. §§ 404.1520, 416.920.  For the first two steps, the claimant must establish (1) that she has not engaged in "substantial gainful activity" since the onset of her alleged disability; and (2) that she suffers from a "severe impairment" or "combination of impairments."  20 C.F.R. §§ 404.1520(a)-(c), 416.920(a)-(c).  Given that a claimant bears the burden of establishing these first two requirements, the failure to meet this burden automatically results in a denial of benefits.  See Bowen v. Yuckert, 482 U.S. 137, 146-47 n.5 (1987).

If the claimant satisfies her initial burdens, the third step requires that she provide evidence that her impairment is equal to or exceeds one of those impairments listed in Appendix

11

1 of the Code of Federal Regulations ("Listing of Impairments").  See  20 C.F.R. §§ 404.1520(d), 416.920(d).  Upon such a showing, she is presumed to be disabled and is automatically entitled to disability benefits.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant cannot satisfy the requirements of the third step, the benefit eligibility analysis proceeds to steps four and five.

The fourth step of the analysis focuses on whether the claimant's "residual functional capacity" sufficiently permits him to resume her previous employment.  See 20 C.F.R. §§ 404.1520(e), 416.920(e).  "Residual functional capacity" is defined as "that which an individual is still able to do despite limitations caused by his or her impairments." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant is found to be capable of returning to her previous line of work, then she is not "disabled" and not entitled to disability benefits.  20 C.F.R. §§ 404.1520(e), 416.920(e).  Should the claimant be unable to return to her previous work, the analysis proceeds to step five.

At step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial gainful work in the national economy, considering her residual functional capacity, age, education, and work experience.  See 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Dictionary of Occupational Titles classifies the different levels of physical exertion, namely, sedentary, light, medium, heavy, and very heavy, that could be associated with a job.  See 20 C.F.R. §§ 404.1567, 416.967.  If the Commissioner cannot satisfy the burden, the claimant shall receive social security benefits.  Yuckert, 482 U.S. at 146-47 n.5.

### C. The Court Remand's Plaintiff's Claims to the ALJ

Plaintiff raises three principal challenges to the ALJ's decision: (1) Plaintiff suffered prejudice as a result of her pro se status and the ALJ's failure to develop a complete record; (2)

the ALJ erred in his conclusion that Plaintiff's mental impairment is "non-severe"; and (3) the ALJ's determination of the jobs Plaintiff is able to perform did not conform with the proper legal standards.[1]  The Court finds that Plaintiff did suffer prejudice as a result of her lack of representation and remands the matter to the ALJ for further proceedings.  However, the Court declines Plaintiff's request to overturn the ALJ's finding as to the severity of Plaintiff's mental impairment on the basis of the present record.  Moreover, the Court is not persuaded by Plaintiff's argument that the ALJ improperly determined the jobs Plaintiff is able to perform.

### 1. Plaintiff Suffered Prejudice from Her Lack of Representation

The fact that a claimant knowingly waives her right to representation at the administrative hearing is not itself sufficient grounds for remand, see Livingston v. Califano, 614 F.2d 342, 345 (3d Cir. 1980), but neither does it preclude a remand.  See Jozefick v. Shalala, 854 F. Supp. 342 (D. Pa. 1994).  When a claimant is unrepresented by counsel before the ALJ, the ALJ is required to exercise a "heightened level of care" and take "a more active role" in obtaining relevant evidence.  Smith v. Harris, 644 F.2d 985, 989 (3d Cir. 1981).  The ALJ "must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).  "In appropriate cases, the ALJ should advise the claimant if vital data is missing or should order a physical examination by a Social Security Administration doctor."  Gachette v. Weinberger, 551 F.2d 31, 41 (3d Cir. 1977).  On review, the role of the court is to determine whether clear prejudice or unfairness results from the claimant's lack of

---

[1] Plaintiff also makes the separate claim that the Commissioner did not properly develop the medical evidence. However, Plaintiff's arguments to this effect overlap fully with his other points and do not demand separate treatment.

counsel or the passivity of the ALJ in developing the record. See Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979). "The essential inquiry is whether the incomplete record reveals evidentiary gaps which result in prejudice to the claimant." Gauthney v. Shalala, 890 F. Supp. 401, 410 (E.D. Pa. 1995).

    Here, the ALJ did not fulfill his duty to clarify evidentiary gaps in the record. At the administrative hearing, Plaintiff testified that she suffers from depression, anxiety and panic attacks, which cause her to feel nervous and prevent her from sleeping and eating. (AR 410, 412). Plaintiff indicated that she takes medication for these conditions. (AR 410; see also AR 133). Plaintiff also reported that she was undergoing "work-ups" at Englewood Hospital and Medical Center ("Englewood") for her alleged psychiatric impairment. (AR 410). Finally, she stated that on at least one occasion she visited the emergency room following a panic attack. (AR 412). The ALJ acknowledged these allegations in his opinion, but held that Plaintiff's psychiatric condition was "non-severe" on the grounds that the record showed she "had never been referred for psychiatric treatment and had never been prescribed psychotropic medications." (AR 29). The ALJ also determined that it was not necessary to undertake additional psychiatric evaluations of Plaintiff. The ALJ based this conclusion on the testimony of two non-treating, non-examining State agency physicians who reviewed Plaintiff's medical records through August 2002. (AR 178, 197).

    The medical record before ALJ Rosenstein at the time of the hearing supported his conclusions with regard to Plaintiff's psychological impairments, but the Court finds that the ALJ took insufficient steps to develop the record in light of Plaintiff's pro se status. The ALJ's determination that Plaintiff has not been treated for psychological conditions is contradicted by

Plaintiff's testimony that she was prescribed medication for her alleged psychological impairments, that she had received some preliminary evaluation at Englewood, and that she had previously visited the emergency room for a panic attack.  This important medical data was missing from the record when ALJ Rosenstein made his finding that the medical evidence did not support Plaintiff's allegations of a severe psychological impairment.  Furthermore, there is nothing to indicate that the ALJ attempted to procure records of these visits, advised Plaintiff to submit these records, or informed Plaintiff of their significance to the decision.

In addition to these evidentiary gaps, the Court notes that the record before the ALJ contained few references to Englewood Hospital, where Plaintiff reported receiving recent medical treatment.  (AR 410).  Those references which the ALJ cites are incomplete or confusingly addressed.  ALJ Rosenstein discusses three emergency room visits to Englewood between January 2002 to February 2004.  (AR 30).  It is unclear from the ALJ's decision whether any evidence on record supports his finding that Plaintiff visited the emergency room in January 2004 but received no treatment.[2]  Moreover, the ALJ acknowledges that the reason for this visit is unknown.  Plaintiff's visit on February 23, 2004 was also sparsely documented.  In the absence of doctor's notes, the ALJ evaluated this consultation on the basis of discharge instructions alone.  (AR 300-1).  The ALJ also mentions a February 6, 2004 visit to Englewood, but the record refers only to a trip made to the Hackensack University Medical Center emergency room.  (AR 299).  Similarly, the ALJ addressed Dr. Padma Chava's evaluation of Plaintiff at Englewood on December 23, 2003, several weeks after the administrative hearing.  (AR 30).  Yet Plaintiff

---

[2] ALJ Rosenstein cites Exhibit 12F in support of this statement. Exhibit 12F, however, refers to inpatient discharge instructions from November 8, 2002.

testified at the hearing that she had recently stopped receiving care at Englewood in order to see Dr. Chava at Hackensack for treatment of her fibromyalgia and degenerative joint disease. (AR 410, 412). Furthermore, Plaintiff listed six visits to Dr. Chava between June 2003 and December 2003 in a statement of her recent medical treatment. (AR 131). Documentation of this care by Dr. Chava, as well as Plaintiff's reported earlier treatment at Englewood, was missing from the record before the ALJ.

In the case of a pro se claimant, the ALJ is not always obligated to obtain current medical evaluations. However, the Third Circuit has suggested that "some lesser effort might be employed, such as advising the claimant of the importance of this information and suggesting that it be submitted at a later date." Hess v. Secretary of Health, Education, & Welfare, 497 F.2d 837, 841 (3d Cir. 1974). Although the Plaintiff confirmed at the administrative hearing that she reviewed the information and that the ALJ had all the relevant information, she may not have been aware of the significance or availability of these records. (AR 402). Plaintiff's testimony indicated that several vital pieces of medical evidence were absent from the record. Because the ALJ had a duty to take a "more active role" in the proceedings, he should have followed up on Plaintiff's testimony by requesting the additional evidence or sending Plaintiff for consultative examinations.[3] The ALJ also could have suggested that these records be submitted at a later date. Thus, although the medical record before the ALJ at the time of the hearing supported his conclusions, the Court finds that the ALJ did not fulfill his duty to take a more active role in

---

[3]The ALJ's reliance on the opinion of non-examining State agency physicians is not a sound basis to forgo further development of this issue. The agency physicians reviewed Plaintiff's record through August 2002. But, as the ALJ notes in his opinion, Plaintiff first made allegations of depression and anxiety in December 2002. The agency physicians thus lacked the benefit of Plaintiff's testimony and her up-to-date medical history.

developing the record.  Because the ALJ's decision was rendered in the absence of relevant medical evidence, the Court also finds that Plaintiff suffered prejudice as a result of an incomplete record.  Accordingly, the Court remands this case for further development of the record.[4]

### 2. The ALJ Made a Proper Determination of the Residual Functional Capacity Required for Plaintiff's Past Relevant Work.

Plaintiff also argues that the ALJ's determination of the mental and physical demands of Plaintiff's past work was not in accordance with the proper legal standards.  This argument is without merit.  Plaintiff first contends that the testimony of a vocational expert was necessary to determine whether Plaintiff's non-exertional psychological and visual impairments would limit her ability to perform work in the sedentary to light range.  However, because the ALJ did not find that Plaintiff suffered from non-exertional limitations that might restrict her functional capacity, this testimony was not required.  (AR 31-32).

Plaintiff further complains that there is a conflict between the ALJ's interpretation of Plaintiff's jobs and their description in the Dictionary of Occupational Titles ("DOT").  The ALJ is not required, however, to rely on the DOT for a description of Plaintiff's past relevant work.  "The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and non-exertional demands of such work."  Burnett v. Commissioner of Social Security Administration, 220 F.3d 112, 123 (3d Cir. 2000)  (internal citation omitted).  Plaintiff's

---

[4] The Court notes Plaintiff's argument that the ALJ erred in his conclusion that Plaintiff's mental impairments is "non-severe," but declines to make this determination on the basis of the record originally before the ALJ.

description of her past clerical jobs accords with the ALJ's determination that her job duties fell in the sedentary to light range. (AR 104, 130). The ALJ did not rigorously inquire into the requirements of Plaintiff's duties as a nursery school cook, but this was not necessary once it was established that Plaintiff could still perform her primary past relevant work as an office assistant.

## III. CONCLUSION

For the reasons discussed above, the Court remands this matter to the ALJ for further proceedings consistent with this opinion. An appropriate order accompanies this opinion.

Dated: August 2, 2007

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.